# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SHERRI ELSON, | Case No.: 2:14-cv-01554-GMN-NJK |
| Plaintiff, | **ORDER** |
| vs. | |
| UNITED HEALTH GROUP INCORPORATED, as Plan Administrator of the UnitedHealth Group Short-Term Disability Plan; SEDGWICK CLAIMS MANAGEMENT SERVICES, as Claims Administrator for the UnitedHealth Group Short-Term Disability Plan; DOES I through V; ROE CORPORATIONS I thru inclusive, | |
| Defendants. | |

Pending before the Court is the Motion for Summary Judgment (ECF No. 38) filed by Defendants UnitedHealth Group, Inc. ("UnitedHealth") and Sedgwick Claims Management Services ("Sedgwick") (collectively "Defendants"). Plaintiff Sherri Elson ("Plaintiff") filed a Response (ECF No. 46), and Defendants filed a Reply (ECF No. 49). For the reasons discussed below, Defendants' Motion for Summary Judgment is **DENIED**.

Also pending before the Court is Plaintiff's Motion for Judgment under Federal Rule of Civil Procedure 52 (ECF No. 39). Defendants filed a Response (ECF No. 42), and Plaintiff filed a Reply (ECF No. 50). Because the Court remands this case and thus declines to award Plaintiff benefits, Plaintiff's Motion for Judgment is **GRANTED in part** and **DENIED in part**.

**I.     INTRODUCTION**

This is an action for short term disability ("STD") benefits pursuant to the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.  The case stems from the alleged wrongful denial of Plaintiff's STD benefits by Sedgwick, the third-party administrator of the UnitedHealth Group Short-Term Disability Plan ("Plan"). (*See* Compl., ECF No. 1).  Plaintiff commenced this action on September 23, 2014 by filing the Complaint. (*Id.*).  Subsequently, Defendants filed the presently pending Motion for Summary Judgment, or, in the alternative, Motion for Judgment under Federal Rule of Civil Procedure 52 (ECF No. 38), and Plaintiff filed a competing Motion for Judgment (ECF No. 39).[1]

**II.    FINDINGS OF FACT**

"In bench trials, [Federal Rule of Civil Procedure] 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. Am. Haw. Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. Pro. 52(a)).  The following constitutes the Court's findings of fact based on the Administrative Record ("AR"), the parties' uncontested admissions, and extrinsic evidence submitted with the Motions presently before the Court.

**A.     Plaintiff's Short Term Disability Coverage Under the Plan**

At all relevant times, Plaintiff was employed by UnitedHealth as a Telemonitor Nurse. (AR at 000101; Compl. ¶ 4).  As a Telemonitor Nurse, Plaintiff "is primarily responsible for oversight of patients monitored remotely via in-home telemonitoring devices." (AR at 000185).

---

[1] The Court is aware of the conflicting standards under which the parties have brought their respective Motions.  In an ERISA case such as this, the Ninth Circuit has held that "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *abrogated on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (en banc).  Accordingly, the Court finds that judgment on the merits pursuant to Federal Rule of Civil Procedure 52 is the appropriate standard under which to review Sedgwick's decision to deny Plaintiff STD benefits.

UnitedHealth describes the occupation as primarily sedentary requiring, *inter alia*, constant (six to eight hours per day) sitting and occasional (up to three hours per day) standing, walking, twisting at the waist, and reaching above or below the shoulder level. (AR at 000185–187).  In addition, the position requires certain cognitive skills including "[h]igh level critical thinking skills to analyze multiple sources of information to formulate logical conclusions and actions." (*Id.*).

As a result of her employment, Plaintiff was a participant in the Plan. (*Id.*). UnitedHealth self-funds the Plan (AR at 000028), which purports to designate Sedgwick as the claims fiduciary for benefits provided under the policy (AR at 000016, 000033).  According to the Plan, Sedgwick has "the exclusive right and discretion, with respect to claims and appeals, to interpret the plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms to the facts." (AR at 000033).  The Plan provides STD benefits equal to sixty percent of the participant's pre-disability income if the participant meets the Plan's definition of "Disabled" and remains disabled through a waiting period of five day consecutive business days. (AR at 000007).  To qualify as "Disabled" for STD benefits under the Plan, the claimant must be "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation because of a non-work related Medical Condition." (AR at 000017).  In addition, a claimant is must satisfy the following four conditions:

- [The claimant has] been seen face-to-face by a Physician about [her] Disability within 10 business days of the first day of absence related to the Disability leave of absence;

- [The claimant's] Physician has provided Medical Evidence that supports [her] inability to perform the Material Duties of [her] Own Occupation;

- [The claimant is] under the Regular and Appropriate Care of a Physician; and

- [The claimant's] Medical Condition is not work-related and is a Medically Determinable Impairment.

(AR at 000007).  "Medical Evidence" is defined as: "Clear documentation, provided by the Physician supporting [the claimant's] Disability, of functional impairments and functional limitations due to a Medically Determinable Impairment that would prevent [the claimant] from performing the Material Duties of [her] Own Occupation . . . safely and/or adequately." (AR at 000018).  "Medically Determinable Impairment" is defined as: "An impairment that results from anatomical, physiological or psychological abnormality which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." (*Id.*).

### B.      Plaintiff's Claim for Short Term Disability Coverage

On October 28, 2013, Plaintiff initiated a claim with Sedgwick for STD benefits based her alleged inability to perform her material job functions from October 25, 2013 to February 26, 2014. (AR at 000099–100).  In a phone interview with a Sedgwick claim representative, Plaintiff reported that she had a pinched nerve and that an MRI revealed severe arthritis and a decompressed nerve. (AR at 000090).  Plaintiff also indicated that she was experiencing shooting pains down her buttocks, legs, and back, and that she was experiencing urinary incontinence. (*Id.*).  She stated that she could not bend at all, and that her feet and legs were swollen such that she could only wear Crock sandals. (*Id.*).  Further, Plaintiff advised Sedgwick that she was being treated by a pain management consultant, Dr. Ahmad Saab, and a rheumatologist, Dr. Farheen Rasool, and that she had severe arthritis in connection with an accident ten years prior in which she was run over by a truck. (*Id.*).

Sedgwick subsequently contacted Dr. Rasool and Dr. Saab requesting "medical documentation for the period[s] of [10/01/2013 and] 10/15/2013 through present." (AR at

000105, 000112, 000118).  Sedgwick also asked the doctors to complete an Attending

Physician Statement. (*Id.*).  Dr. Rasool responded to Sedgwick's request for information on

October 17, 2013, and advised Sedgwick that Plaintiff had been diagnosed with spondylosis, or

age-related degeneration of the spinal disks. (AR at 000083, 000084).

On November 14, 2013, a registered nurse examiner performed an initial clinical review

of Plaintiff's file on behalf of Sedgwick. (AR at 000078-82).  At that time, Plaintiff's file

included Dr. Rasool's October 17, 2013 response and an MRI dated October 16, 2013. (AR at

000078, 000146).  The nurse examiner concluded that the medical information available to

Sedgwick did not substantiate awarding Plaintiff STD benefits. (AR at 000081).  Specifically,

the examiner found:

> Given there is indication that this is not a new condition and there is
> no indication as to what has changed on 10/25 that the [employee] is
> unable to perform her sedentary job functions and there are no
> exams to review indicating functional limitations, medical
> information available does not support that the [employee] would be
> unable to perform her job functions at this time.

(*Id.*).  Based on the nurse examiner's clinical review, on November 15, 2013, Sedgwick denied

Plaintiff's claim. (AR at 000146–148).  Sedgwick's denial letter stated in part:

> There is insufficient evidence to confirm your symptoms had
> persisted at a level to be impairing or to substantiate an extension of
> disability. There is indication that this is not a new condition and
> there is no indication as to what has changed, that limits you from
> performing your sedentary job functions.  Also, there are no exams
> to review indicating functional limitations.

(AR at 000146).

On November 19, 2013, Sedgwick issued an updated denial letter to reflect receipt of a

November 8, 2013 report completed by Dr. Rasool. (AR at 000167–169).  In the report, Dr.

Rasool listed Plaintiff's functional limitations, including: "bending down; twisting, sitting and

standing for more than 15 minutes at a time." (AR at 000162).  Dr. Rasool also indicated that

Plaintiff's "weakness and pain were subjective." (AR at 000074).  Aside from the clarification that its review of Plaintiff's file included Dr. Rasool's November 8, 2013 report, Sedgwick's updated denial letter matched the language of the original denial letter almost verbatim. (*See* AR at 000146, 000167).

### C.   Plaintiff Appeals the Denial of Her Claim

On November 26, 2013, Plaintiff timely appealed Sedgwick's decision. (AR at 000172–176).  In response, a Sedgwick claims representative interviewed Plaintiff a second time. (AR at 000066–68).

During the pendency of the appeal, Plaintiff was admitted overnight to University Medical Center on December 3, 2013 for intractable back pain and urinary incontinence. (AR at 000214–217).  Physicians at University Medical Center performed a lumbar CT scan and an MRI. (*Id.*).  A University Medical Center physician reviewed Plaintiff's CT scan and concluded that the scan showed L5-S1 minimal collapse and chronic changes, an anterior bulge, and anterior and posterior osteophytes with bilateral neuroforaminal encroachment, but "no great encroachment on the nerve root." (AR at 000217).  Another physician conducted a physical examination and noted that Plaintiff was experiencing diffuse low back tenderness and limited gait due to pain. (AR at 000218).  The physician further noted that Patient's MRI results were indicative of "moderate to marked [L5-S1] foraminal narrowing bilaterally, [which] correlate to L5 symptoms." (*Id.*).

Following her discharge from University Medical Center, Plaintiff followed up with her primary physician, Dr. Robert Tolentino. (AR at 000247).  Dr. Tolentino noted that Plaintiff reported "significant pain" and that she was "unable to perform her duties at work due to back pain and drowsiness from pain medications." (AR at 000248).  Dr. Tolentino further noted that Plaintiff was experiencing lumbar tenderness and diagnosed her with lumbar disc degeneration. (*Id.*).

1
2
3
4
5
6
7
8
9
10
11
12

Subsequently on December 23, 2013, Sedgwick referred Plaintiff's file to Network Medical Review Co., Ltd. for medical pain management and urologic review. (AR at 000272–273).  Sedgwick specifically requested, *inter alia*, that the reviewing physicians address, "[b]ased on the medical evidence provided by the employee and her treating provider(s), [whether] the employee [is] disabled from her regular unrestricted job as of 10/25/2013 through Present." (*Id.*).  At this stage, Plaintiff's medical evidence had expanded to include, *inter alia*, Dr. Tolentino's progress notes from October 9, 2013 to December 9, 2013 as well as University Medical Center records from December 3, 2013 to December 4, 2013. (AR at 000473, 000477). In response to Sedgwick's referral request, two physicians reviewed Plaintiff's written file and prepared reports regarding their findings: Dr. Jamie Lee Lewis, a physician board-certified in pain medicine, physical medicine, and rehabilitation; and Dr. Marcel Horowitz, a board-certified urologist.

13
14
15
16
17
18
19

Dr. Lewis concluded that "[f]rom a pain medicine perspective the claimant is not disabled." (AR at 000479).  Dr. Lewis explained in his report: "Clinical findings do not document any significant neurological deficits on exam, and furthermore, diagnostic studies are not significant for any nerve impingement, which would impact functioning. These findings would not preclude the claimant's ability to function at her regular unrestricted occupation." (*Id.*).  Dr. Lewis also concluded that: "The objective evidence is not consistent with [Plaintiff's] subjective complaints." (*Id.*).

20
21
22
23
24

Dr. Horowitz, concluded that: "There is no indication that the incontinence described was sufficiently severe to support the need to consider disability on a urologic basis." (AR at 000474).  Although Dr. Horowitz was able to speak with Dr. Saab regarding Plaintiff's urologic symptoms, Dr. Saab was not able to speculate on whether Plaintiff was disable for urologic reasons because "he was not in the habit of determining disability." (AR at 000473).

25

Based on these findings, Sedgwick issued a denial of Plaintiff's appeal on January 10, 2014. (AR at 000485–487).  In its denial letter, Sedgwick summarized Plaintiff's medical documentation which "indicates [Plaintiff's] diagnoses include low back pain . . . fibromyalgia, and incontinence." (AR at 000486).  The letter went on to inform Plaintiff that her MRI

> revealed multi-level spondylosis at l5-Sl, disc space narrowing, and desiccation that had progressed from the comparison study with posterior broad based disc bulge and moderate bilateral LS foraminal narrowing. However, it does not show [Plaintiff to] have a nerve impingement that would impact [her] ability to function. [Plaintiff's] examination findings were normal and [her] strength was a 5/5 in all muscle groups tested.

(*Id.*).  Sedgwick ultimately concluded that "[b]ased on the submitted medical documentation, there were no objective medical findings contained in the submitted documentation to support impairments" sufficient to warrant a finding that Plaintiff was disabled. (*Id.*).

### D.    Plaintiff's Second-Level Appeal

On January 30, 2014, Plaintiff filed a second-level appeal of Sedgwick's denial of her claim for STD benefits. (AR at 000499–500).  In support of her appeal, Plaintiff's counsel submitted a detailed letter outlining Plaintiff's position on appeal and attached a selection of records from Plaintiff's medical providers. (AR at 000508–541).  Plaintiff subsequently returned to work sometime between February 26, 2014 and March 4, 2014. (AR at 000640; Mot. for J. 11:21, ECF No. 39).

On April 14, 2014, Sedgwick advised Plaintiff's counsel that the UnitedHealth Disability Appeals Committee had reviewed Plaintiff's request for a second-level appeal and had requested that an additional independent physician review be conducted with respect to Plaintiff's claim for STD benefits. (AR at 000545).  Accordingly, Dr. David Knapp, a board-certified rheumatologist, prepared a report summarizing his analysis of Plaintiff's claim for

short-term disability benefits based on his review of Plaintiff's medical records. (AR at 00546–552).

At this point, Plaintiff's records had developed to include, *inter alia*, a report completed by Dr. Tolentino on January 3, 2014 in response to Plaintiff's request for leave pursuant to the Family Medical Leave Act. (AR at 000768).  In that report, Dr. Tolentino noted that Plaintiff's condition commenced on October 24, 2013 and had a probable duration of six months. (AR at 000768).  Dr. Tolentino also indicated that Plaintiff was unable to perform her job functions because she was "unable to sit or stand without significant pain." (AR at 000769).  He explained that Plaintiff was experiencing "severe low back [pain] with bilateral radiculopathy" due to "broad based L5-S1 disc bulge and moderate bilateral L5 foraminal narrowing" demonstrated by the October 16, 2013 MRI. (*Id.*).  As a result, Dr. Tolentino concluded that it was "medically necessary for [Plaintiff] to be absent from work" because "[the] narcotics [Plaintiff] use[s] to treat pain may impact mental and physical function." (AR at 000770).

Based on his review of Plaintiff's medical records, Dr. Knapp concluded that "[f]unctional impairment related to osteoarthritis is supported by the clinical evidence in the medical file review" including, *inter alia*: decreased lumbar range of motion due to pain; MRI findings indicating moderate foraminal stenosis at L5-S1, facet hypertrophy, and progressed degenerative changes since 2011; arthritic changes, disc space narrowing at L5-S1, spondylolisthesis, and facet disease noted on x-ray; and physical therapy exam findings. (AR at 000551).  Dr. Knapp determined that Plaintiff's impairments translated into the following restrictions and limitations:

> ability to sit for 6 hours/day with opportunity to change positions hourly, stand for 1 hour at a time for total of 4 hours/day, walk for 30 minutes at a time for a total of 2 hours/day, unrestricted reaching at all levels and use of the hands and upper extremities. Weight restrictions of 20 lbs. occasionally for push/pull/lift/carry and up to 10 lbs frequently with occasional bend/twist and knee with no squat/crouch/ climb or crawl.

1    (*Id.*).  Dr. Knapp noted that his suggested "restrictions and limitations are permanent.  As the

2    process is degenerative and progressive, [Plaintiff's] condition will worsen with time." (*Id.*).

3    However, Dr. Knapp concluded that Plaintiff's "restrictions and limitations would not result in

4    total inability to perform [her] occupation." (AR at 000552).  Dr. Knapp also stated that

5    Plaintiff "does not have total inability to perform any occupation and could perform a sedentary

6    physical demand level occupation with the restrictions and limitations [articulated in the

7    report]." (*Id.*).

8            Based on Dr. Knapp's conclusions, the UnitedHealth Disability Appeals Committee

9    upheld Sedgwick's decision to deny Plaintiff STD benefits, explaining that "the STD claim

10   process were [sic] followed and . . . there is no basis to overturn the previous decisions." (AR at

11   000563).  Plaintiff subsequently filed the instant lawsuit on September 23, 2014. (*See* Compl.).

12   **III.    LEGAL STANDARD**

13           When it enacted ERISA, Congress did not specify the standard of review courts should

14   apply in deciding a plan participant's judicial challenge of a denial of benefits. *See Franchise*

15   *Tax Bd. v. Constr. Laborers Vacation Trust*, 433 U.S. 1, 24 n. 26 (1983).  Rather, it expected

16   federal courts to develop a body of common law to govern those claims and to determine the

17   appropriate standard of review. *Id.*  The Supreme Court addressed the standard of review that

18   courts must apply in reviewing ERISA cases challenging a plan administrator's denial of

19   benefits in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989).  The Supreme

20   Court held that because the plan administrator in ERISA plans stands in a fiduciary relationship

21   to plan participants, courts reviewing plan decisions should apply general trust principles. *Id.* at

22   102.  In assessing the applicable standard of review, district courts should start with the

23   wording of the plan itself. *Id.*

24           If a plan grants discretionary authority to the plan administrator to construe disputed or

25   doubtful terms in the plan and to make final benefits determinations, courts apply an abuse of

discretion standard of review. *Firestone*, 489 U.S. at 115. "[T]he test for abuse of discretion . . . is whether [the Court is] left with a definite and firm conviction that a mistake has been committed." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (citations omitted). "What deference means is that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Id.* at 675 (quoting *Conkright v. Frommert*, 559 U.S. 506, 520 (2010)). In so determining, the Court considers whether an administrator's benefits determination was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.*

In order for the abuse of discretion standard to apply, however, the plan must unambiguously provide discretion to the administrator. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc). "There are no 'magic' words that conjure up discretion on the part of the plan administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). The Ninth Circuit has repeatedly held that granting the power to interpret plan terms and to make final benefits determinations confers discretion on the plan administrator. *See id.*; *Bergt v. Ret. Plan for Pilots Employed by MarkAir Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159 (9th Cir. 2001).

However, when an entity both determines eligibility for benefits and pays benefit awards, it operates under a "structural conflict of interest." *Abatie*, 458 F.3d at 965 ("[A]n insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest."). Under these circumstances, "a deferential standard of review remains appropriate even in the face of a conflict." *Conkright*, 559 U.S. at 511. Nevertheless, "[a]pplying a deferential standard of review does not mean that the plan administrator will prevail on the merits." *Id.* at 520. Instead, a court's application of deference requires that "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Salomaa*, 642 F.3d at 675 (quoting *Conkright*, 559 U.S. at 520).

If the terms of the plan do not confer discretionary authority on the plan administrator, courts reviewing a plan administrator's decision denying benefits apply a *de novo* standard of review. *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Emps. of Transferred GE Operations*, 244 F.3d 1109, 1113 (9th Cir. 2001). *De novo* is the default standard of review. *Firestone*, 489 U.S. at 115. "If *de novo* review applies, no further preliminary analytical steps are required. The court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie*, 958 F.3d at 963.

## IV.   CONCLUSIONS OF LAW

### A.   Standard of Review

The parties dispute what standard of review should be applied to Sedgwick's denial of benefits. Defendants argue that "the express language of the Plan grants Sedgwick discretionary authority to determine eligibility for benefits and interpret the Plan." (MSJ 8:25–26). Indeed, the Plan states that

> the Claims Administrator [Sedgwick] has the exclusive right and discretion, with respect to claims and appeals, to interpret the applicable plan's terms, to administer the plan's benefits, to determine the applicable facts and to apply the plan's terms of the facts. The Claim Administrator's decisions are conclusive and binding.

(AR at 000033; *see also* AR at 000016). This language mirrors the plan in *Abatie* which gave the administrator the responsibility to interpret the terms of the plan and to determine eligibility for benefits. *Abatie*, 458 F.3d at 965 ("By giving the plan administrator 'full and final' authority, and vesting such authority 'exclusively' in the administrator, . . . this provision is sufficient to vest discretion in the plan administrator."). In addition, the Plan clearly designates Sedgwick as the claims administrator and "fiduciary with respect to the . . . Plan." (AR at 000033; *see also* AR at 000016).

1

In support of *de novo* review, Plaintiff disputes that UnitedHealth "properly confer[ed]

2

jurisdiction upon Sedgwick as a plan fiduciary with discretionary authority." (Mot. for J.

3

16:24–25, ECF No. 39).  Specifically, Plaintiff argues that UnitedHealth failed to follow the

4

Plan's procedures for amending the Plan to grant Sedgwick discretionary authority.[2] (*Id.* 17:17–

5

19).  Defendants admit "the Plan was amended twice during the pendency of [Plaintiff's] claim

6

for short-term disability benefits." (Resp. to Mot. for J. 3:14–18, ECF No. 42).  However,

7

Defendants' corresponding citations do not point to amendments to the Plan but to amendments

8

to a 2009 Master Services Agreement between UnitedHealth and Sedgwick. (*Id.*; Ex. A to Decl.

9

of Bruce Monte, ECF No. 45-1).  Defendants also submit a 2010 Resolution of the

10

UnitedHealth Board of Directors purporting to adopt certain amendments to the Plan, but the

11

Resolution does not contain any description of the amendments. (*See* Ex. B to Decl. of Bruce

12

Monte, ECF No. 45-2).

13

Because of these incongruities, the Court cannot discern whether the Plan was ever

14

amended during the relevant period, and if so, whether UnitedHealth followed the Plan's

15

amendment process.  Nevertheless, the Court finds this issue immaterial to the analysis

16

because, even assuming *arguendo* that an abuse of discretion standard applies, Defendants

17

unreasonably denied Plaintiff's STD claim in at least four ways: (1) Sedgwick dismissed

18

medical opinions from Plaintiff's treating physicians without explanation;  (2) Sedgwick

19

demanded objective evidence of a condition for which there are no objective tests and ignored

20

what objective evidence did exist; (3) Sedgwick failed to engage in a "meaningful dialogue"

21

22

[2] ERISA requires that a plan "specify both an amendment procedure and a procedure for identifying persons with authority to amend." *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 937 (9th

23

Cir. 2003) (citing 29 U.S.C. § 1102(b)(3)) ("These amendment procedures, once set forth in a benefit plan, constrain the employer from amending the plan by other means.").  Some courts in this circuit

24

have held that a denial of benefits claim must be reviewed *de novo* if the administrator fails to delegate administrative authority in accordance with the plan's amendment procedure. *See, e.g.*, *Burkett v.*

25

*Union Sec. Ins. Co.*, No. C06-1021RSL, 2007 WL 1687770, at *5 (W.D. Wash. June 7, 2007) (applying a *de novo* standard because administrator failed to demonstrate that it followed plan's amendment procedures).

with Plaintiff regarding her claim; and (4) Sedgwick's review did not adhere to the terms of the Plan.

### B.   Sedgwick Arbitrarily Discredited Dr. Rasool and Dr. Torentino's Reliable Medical Opinions

Although Sedgwick was not required to accord special weight to the opinions of Plaintiff's treating physicians, the Court finds that it was improper for Sedgwick to discredit Dr. Rasool and Dr. Tolentino's opinions regarding Plaintiff's diagnoses and functional capacity in the absence of reliable evidence to the contrary. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that while "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician," "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician").

Here, the record clearly demonstrates that Sedgwick and its reviewing physicians gave only minimal consideration, if any, to Dr. Rasool and Dr. Tolentino's medical opinions. Specifically, neither Sedgwick nor Dr. Lewis ever indicated whether Dr. Rasool's diagnoses of fibromyalgia, lumbar disc degeneration, and chronic pain and Dr. Torentino's diagnoses of bilateral radiculopathy, broad based L5-S1 disc bulge, and moderate bilateral L5 foraminal narrowing were correct. Instead, Sedgwick's denial letters selectively parrot some of these diagnoses without discussing whether or to what extent those diagnoses would affect Plaintiff's functional limitations. Moreover, despite their brief mention in Dr. Knapp's report, Sedgwick and its reviewing physicians appear not to have considered Dr. Tolentino's updated records with objective findings of Plaintiff's impairment to any significant degree.

Rather, Dr. Lewis simply concluded that Plaintiff was capable of performing full-time sedentary work because "[t]he objective evidence is not consistent with [Plaintiff's] subjective complaints." (AR at 000479).  Similarly, Sedgwick cited the absence of "objective medical

findings contained in the submitted documentation to support impairments" as the basis for its denial of benefits. (AR at 000486).  However, despite conclusory references to the absence of objective medical data, Sedgwick failed to identify specific parts of the medical record that refute Plaintiff's treating physician's diagnoses and functional capacity assessments.  In fact, the record is devoid of any reliable evidence tending to cast doubt on Dr. Rasool and Dr. Torentino's medical opinions that Plaintiff was incapable of performing her occupation.  Accordingly, the Court finds that Sedgwick arbitrarily, and thus improperly, discredited Plaintiff's reliable evidence, including the opinions of Dr. Rasool and Dr. Torentino.

## C.   Sedgwick Improperly Based Its Determination of the Lack of Objective Medical Evidence

Sedgwick's denial of benefits throughout its handling of Plaintiff's claim was unreasonably based primarily on a lack of "objective medical findings contained in the submitted documentation to support impairments." (AR at 000486; *see also* AR at 000146, 000167, 000551).  According to the Plan, a "Medically Determinable Impairment" cannot be established "by the individual's statement of symptoms" alone. (AR at 000018).  Instead, a claimant must also present "Medical Evidence consisting of signs, symptoms and laboratory findings." (*Id.*).  "Medical Evidence" includes "[c]lear documentation, provided by the Physician supporting [the claimant's] Disability, of functional impairments and functional limitations." (*Id.*).  Sedgwick's denials reiterate its requirement that Plaintiff provide "objective medical findings" to support her inability to perform the duties of her occupation, but do not explain why the information Plaintiff already provided is insufficient for that purpose.  In particular, Sedgwick's denial letters fail to explain why Dr. Rasool and Dr. Tolentino's records and the MRIs do not amount to "objective medical findings." *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008).

Sedgwick's insistence on objective evidence is also problematic because medical conditions such as fibromyalgia and chronic pain may not be amendable to objective verification. *See, e.g.*, *Saffon*, 522 F.3d at 872–73 (holding that "individual reactions to pain are subjective and not easily determined by reference to objective measurements"). Here, Sedgwick and the physicians' reports upon which it relied do not to discuss whether or to what extent Plaintiff's self-reported symptoms were disabling. Instead, Sedgwick discredited and dismissed Plaintiff's subject evidence of pain without explanation. Dr. Knapp noted some restrictions and limitations including the "ability to sit for 6 hours/day with opportunity to change positions hourly," but nevertheless concluded that Plaintiff "does not have total inability to perform any occupation." (AR at 000551–552). In Sedgwick's letter denying Plaintiff's first appeal, Segwick conceded that Plaintiff's MRI "revealed multi-level spondylosis at L5-S1, disc space narrowing, and desiccation that had progressed form the comparison study with posterior broad based disc bulge and moderate bilateral L5 foraminal narrowing," but concluded that "there was no objective medical findings . . . to support impairments that would have precluded [her] from performing [her] occupation." (AR at 000486). However, these assessments are directly in conflict with Plaintiff's subjective complaints of pain and her physicians' functional assessments thereof.

If Sedgwick felt that the medical records were insufficient to verify Plaintiff's disability, it was incumbent upon Sedgwick to inform Plaintiff of the deficiency so that she might proffer any additional needed documentation. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) (finding that where the record is insufficient to make a disability determination, the plan administrator has a duty to inform the claimant of the deficient record and provide an opportunity to furnish the missing information). However, Sedgwick never offered any guidance as to what type of "objective" evidence would be sufficient to corroborate Plaintiff's subjective complaints of pain.

D.     Sedgwick Failed to Engage in a "Meaningful Dialogue"

Under ERISA, a claimant is entitled to a "full and fair" review of a denial. 29 U.S.C. § 1133.  A "full and fair review" occurs when an administrator engages in a "meaningful dialogue" with the claimant. *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  Specifically, a "meaningful dialogue" is evidenced by a statement by the administrator indicating the reasons for the denial, and by administrators asking beneficiaries for more information, if needed, to make a reasoned decision. *Id.*; *see also* 29 C.F.R. § 2560.503–1(f)(3) (requiring the administrator explain any "additional information needed" upon a denial).

Sedgwick claims to have complied with this requirement by "explain[ing] to [Plaintiff] in detail the reasons for the denial[s]." (Resp. 5:16–17).  However, Sedgwick's explanations for denying Plaintiff's claims in its preliminary letters merely repeated the same four sentences that fail to clairfy how Plaintiff fell short of the Plan's requirements. (*See* AR at 000146, 000167). For example, Sedgwick's initials denial letters deny Plaintiff's claim in part because Plaintiff's symptoms are "not a new condition and there is no indication as to what has changed." (*Id.*). However, the October 16, 2013 MRI, available to the nurse examiner for review (*see* AR at 000078), stated that Plaintiff had experienced "[a]dvanced disc space narrowing and dessication [which] appear[ed] *progressed* from the [previous MRI]." (AR at 000142–143) (emphasis added).  Sedgwick's denials fail to account for Plaintiff's degenerative condition and thus do not provide Plaintiff with any meaningful understanding for why Sedgwick rejected Plaintiff's claim or how Plaintiff could supplement the record on appeal.

Similarly, Sedgwick's denials of Plaintiff's subsequent appeals lack any additional explanation that would amount to a "meaningful dialogue."  In particular, Sedgwick claims it reviewed Dr. Rasool and Dr. Tolentino's reports, however, throughout the claims process Sedgwick merely noted that it received and considered Plaintiff's treating physicans'

statements or selectively recited their findings. (*See* AR at 000146, 000167, 000485).  The record is devoid any actual discussion of Dr. Rasool and Dr. Tolentino's findings or why Sedgwick considered them defective.  Indeed, nowhere do Sedgwick's denial letters ever mention Dr. Rasool's opinion that Plaintiff could not sit for longer than fifteen minutes at a time or Dr. Tolentino's finding that Plaintiff's prescriptions would impair Plaintiff's decision making capabilities.

Further, as discussed *supra*, Sedgwick failed to explain how Plaintiff's evidence failed to constitute "Medical Evidence consisting of signs, symptoms and laboratory findings." (AR at 000018).  Instead, Sedgwick summarily dismissed Plaintiff's medical documentation, including her MRIs, on the basis that "there were no objective medical findings contained in the submitted documentation." (*Id.*).  Sedgwick never provided Plaintiff guidance on what evidence it considered "objective."  Plaintiff was entitled to a description of this information, as well as an explanation of why the documents she did submit lacked the requisite objectivity. *See Booton*, 110 F.3d at 1463.  Accordingly, the Court finds that Sedgwick abused its discretion by failing to engage in a "meaningful dialogue" with Plaintiff in violation of ERISA's notice requirements.

### E.    Sedgwick's Denials Failed to Apply the Plan's "Disabled" Standard

Sedgwick abused its discretion by failing to hold Plaintiff's STD benefits claim to the standard of "Disabled" articulated in Plan. *See, e.g.*, *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999)) (noting an administrator abuses its discretion if it "construes provisions of the plan in a way that conflicts with the plain language of the plan"). According to the Plan, to qualify as "Disabled" for STD benefits, the claimant must be "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation." (AR at

000017).  Plaintiff's occupation as a Telemonitor Nurse requires constant sitting of "six to eight hours per day" and "[h]igh level critical thinking skills." (AR at 000185–187).

None of the reports propounded by Sedgwick discuss whether Plaintiff was able to perform the material aspects of her occupation with "reasonable continuity." (AR at 000017). Instead, the reports submitted by Dr. Horowitz and Dr. Lewis broadly conclude that Plaintiff was "not disabled." (AR at 000474, 000479).  Dr. Knapp's report further concludes that Plaintiff "does not have *total inability* to perform any occupation." (AR at 000552) (emphasis added).  Importantly, there is no indication that the reviewing physicians made their disability determinations based on the Plan's definition of "Disabled," nor is there any indication that the reviewing physicians considered whether Plaintiff could perform her job functions with "reasonable continuity."

Three documents are particularly relevant to Plaintiff's ability to perform her job functions with "reasonable continuity": (1) Dr. Rasool's report listing Plaintiff's functional limitations to include "sitting and standing for more than 15 minutes at a time" (AR at 000162); (2) Dr. Tolentino's report opining that "[the] narcotics [Plaintiff] use[s] to treat pain may impact mental and physical function" (AR at 000770; *see also* AR at 000248); and (3) Dr. Knapp's report concluding that Plaintiff could "sit for 6 hours/day with opportunity to change positions hourly" (AR at 000551).  Noticeably absent from Dr. Knapp's discussion regarding Plaintiff's functional limitations is consideration of whether the "opportunity to change positions hourly" comports with Plaintiff's ability to perform her sedentary job functions with "*reasonable continuity*." (AR at 000017) (emphasis added).  Considered in the aggregate these reports suggest that while Plaintiff may not be "totally disabled," there are some limitations on Plaintiff's ability to sit with "reasonable continuity."  Further, Dr. Tolentino's report indicates that Plaintiff's prescriptions might impact her ability to "formulate logical conclusions" regarding in-home patients' vital signs. (AR at 000185).  No other report even mentions this

possibility let alone discusses the probable impact of Plaintiff's medications on her material job functions.

Not only does Sedgwick fail to account for these conclusions, by failing to explain its interpretation of "Disabled" Sedgwick appears to have accepted Dr. Knapp's heightened "totally disabled" standard in place of the Plan's "reasonable continuity" standard. Indeed, Sedgwick's denial letters each refer to Plaintiff's ability to "perform" her occupation without any discussion of whether such performance could be accomplished with "reasonable continuity." (*See* AR at 000146, 000167, 000486). As a result, Sedgwick abused its discretion by denying Plaintiff's claim based on a standard of "Disabled" that conflicts with the terms of the Plan.

## V.   **APPROPRIATE REMEDY**

"[R]emand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination." *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996); *see also Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008) ("Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance."). However, "retroactive reinstatement of benefits is appropriate in ERISA cases. . . where there [is] no evidence in the record to support a termination or denial of benefits." *Grosz–Salomon*, 237 F.3d at 1163 (citations removed).

Here, Sedgwick's failure to engage in a "full and fair review" of Plaintiff's claims renders the Court unable to determine why Plaintiff's claim was denied. Specifically, the Court cannot determine based on the record whether Plaintiff was able to perform the material aspects of her job functions with "reasonable continuity." As a result, the Court is unable to find that

there is "no evidence in the record to support a termination or denial of benefits." *Id.*  The Court therefore finds that the appropriate remedy is to remand this case for further administrative review. *See id.*  If, upon further administrative review, Sedgwick affirms its decision to deny Plaintiff benefits, Plaintiff may appeal to the Court at that time.

## VI.    CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment under Federal Rule of Civil Procedure 52 (ECF No. 39) is **GRANTED in part** and **DENIED in part.**

**IT IS FURTHER ORDERED** that the Court finds that Defendants abused their discretion in denying her claim for short-term disability benefits.

**IT IS FURTHER ORDERED** that Plaintiff's request that the Court order an award of benefits is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 38) is **DENIED**.

**IT IS FURTHER ORDERED** that the matter is **REMANDED** to the claims administrator to conduct a "full and fair review" of Plaintiff's claim "that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary" as required by 29 C.F.R. § 2560.503–1(h).

The Clerk of the Court shall close the case.

**DATED** this ___22___ day of March, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge